IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 17, 2018 Session

## STATE OF TENNESSEE v. CHRISTOPHER RUSSELL

**Appeal from the Circuit Court for Marion County**
No. 9847     Thomas W. Graham, Judge

_____

### No. M2017-01152-CCA-R3-CD

_____

The Defendant, Christopher Russell, appeals his convictions for second degree murder and aggravated child abuse and his effective twenty-five-year sentence. On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred in denying his motion to continue the trial; (3) the trial court erred in denying his motion for new trial based on newly discovered evidence; and (4) his sentences are excessive. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

John H. Baker III (on appeal), Murfreesboro, Tennessee; William B. Bullock (at trial), Murfreesboro, Tennessee; and Judith St.Clair (at trial), Manchester, Tennessee, for the appellant, Christopher Russell.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; Mike Taylor, District Attorney General; and Steve Strain and Julia Veal, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Defendant was convicted of abusing and killing his three-month-old son. The victim's mother was the Defendant's fiancée, and in August 2011, the victim's mother

learned that she was two months pregnant. The victim's mother recalled that the Defendant was excited when he first learned of the pregnancy. She stated that as the weeks passed, the Defendant was "just wanting to do his own thing" and that they argued as a result. When the victim's mother was in her eighth month of pregnancy, the Defendant wanted to be "free and single" and play pool with his friends.

The victim's mother maintained regularly scheduled doctor's appointments throughout her pregnancy. She testified that she did not feel the victim moving during the day and felt him moving in "spurts" at night. She believed the victim was more active while she was sleeping. She stated that she discussed the issue with her doctors, who told her there was no medical reason for concern. The victim's mother had ultrasounds during many of her doctor's appointments to ensure that the victim was moving.

The victim's mother testified that when the victim was born in March of 2012, the umbilical cord was around his neck. The victim was not crying initially but began crying after he was suctioned. At one point, his blood sugar dropped, and medical personnel had to give him a bottle of formula. His right hip also was out of joint. The victim and his mother remained in the hospital for three days.

The victim's mother described the victim as "a fussy baby, but easy at the same time." She regularly took the victim to his pediatrician because the victim was spitting up or "profusely puking," and she had to change the victim's formula three times as a result. The victim's mother cared for the victim at night. The Defendant was an over-the-road truck driver who was away from home often during the week and returned on weekends. He cared for the victim during the days that he was home. The victim's mother took nine weeks of maternity leave and returned to work in May of 2012. The victim's grandmother, who lived next door, cared for the victim while his mother was working. The victim's mother stated that she never saw his grandmother do anything in caring for the victim that caused her concern.

The victim's mother testified that the Defendant became jealous of her relationship with the victim and told her on multiple occasions, "You love him more than me." She said that while she was singing to the victim, the Defendant asked her why she did not sing to him also. The victim's mother testified that on one occasion, she and the Defendant stopped to eat at a drive-through restaurant while returning from visiting family in Georgia. She and the victim were in the backseat while the Defendant ate his food. The Defendant offered to feed the victim while the victim's mother ate. The victim's mother stated that while eating, she heard a "thump" and asked the Defendant about it. The Defendant told her that the victim was fussy and hit his head on the steering

wheel. The victim's mother asked to see the victim, but the Defendant refused to allow her to see him.

The victim's mother recalled that when the victim was around two months old, she became twisted in sheets while preparing to lie in bed with the victim. She fell toward the pillow on which the victim was lying, but she denied falling on top of the victim.

The Defendant was off work for two weeks due to a medical issue during the end of May and early June of 2012 and then returned to work. The Defendant returned home from a road trip on Thursday, June 14, 2012, prior to Father's Day. After returning from work on Friday morning June 15, the victim's mother retrieved the victim from his grandmother's home and returned home where the Defendant was sleeping. The victim's mother had made plans for her, the Defendant, and the victim to meet the victim's grandmother at a lake. When they stopped to purchase gasoline, the victim vomited profusely so they returned home where the victim's mother bathed the victim and allowed him to rest. The victim's mother contacted the victim's pediatrician, who advised her to bring the victim to his office if the victim vomited again. The victim's mother stated that she had taken the victim to see his pediatrician the prior weekend for a follow-up appointment after the victim had been previously diagnosed with an ear infection.

The Defendant tended to the victim on Saturday morning, changing his diaper and feeding him. The Defendant, the victim's mother, and the victim then visited family in Alabama. The victim's mother stated that the victim continued to be fussy.

On Sunday, June 17, the Defendant, the victim's mother, and the victim went to a restaurant to celebrate Father's Day, and the victim became sick while at the restaurant. The victim's mother stated that the victim was fussy when they returned home and that the Defendant fed the victim while she cleaned the home. However, the Defendant was unable to calm the victim. The victim's mother said that when she returned to the room, the Defendant gave her the victim, who went limp and stopped breathing. The Defendant began performing CPR, while the victim's mother yelled for help out of the back door. The victim's mother called 9-1-1 and recalled that at one point, the victim projectile vomited a substance that appeared to be milk. A neighbor took the victim outside to meet the ambulance.

After rendering aid, the paramedic transported the victim to the local hospital. From there, the victim was flown to Vanderbilt Hospital. Medical personnel informed the Defendant and the victim's mother that the victim had blood on his brain and that the personnel had contacted the Department of Children's Services. The victim's mother stated that she spoke to a police officer early the next morning. She also stated that the

Defendant did not make any statements to her regarding how the victim may have been injured. On June 22, medical personnel stated that the victim was brain dead, and the Defendant and the victim's mother decided to remove him from the ventilator. The victim died the next day.

The victim's mother testified that toward the end of the week, the Defendant told her that he planned to tell the investigative officer that he had tripped over the air vent on the kitchen floor and tossed the victim onto the couch as he was falling. The victim's mother asked the Defendant why he had not told her sooner, and he replied that he was afraid she would be angry at him. The Defendant never told the victim's mother that he had dropped the victim in the bathtub.

The victim's mother stated that after she and the Defendant left the hospital following the victim's death, the Defendant wanted to watch a movie and asked her to engage in sexual intercourse. The victim's mother refused and asked the Defendant how he could want to engage in sex after they just lost their son. The Defendant also attempted to initiate sexual intercourse with her the next morning. The victim's mother testified that the Defendant said he wanted to have sex with her because "they were going to try to railroad him and that he might have to go to jail." The Defendant did not accompany the victim's mother to make funeral arrangements for the victim because he was trying to hire an attorney. The Defendant did not attend the family visitation and was one hour late to the victim's funeral. At one point, the Defendant told the victim's mother that "the autopsy is going to come back, it's going to say one thing, but it doesn't mean that it's going to mean that. They're just trying to make it look good for them." The Defendant and the victim's mother separated shortly after the victim's death. They resumed their relationship in August 2012 and remained together for approximately eight months. The victim's mother denied ever harming the victim.

On cross-examination, the victim's mother testified that the victim stopped breathing while they were on their way home from the hospital following the victim's birth. She said the victim stopped breathing on two other occasions while she was at work, and the victim turned blue during one of the episodes. The doctors told the victim's mother that the victim was experiencing sinus issues and instructed her to insert saline in his nose. The victim's mother acknowledged that the victim was underdeveloped, losing weight, and vomiting often. She said she and the Defendant were concerned that the victim was not getting sufficient nutrients and formula. She also said that while the doctors instructed her on multiple occasions to change the victim's formula, she and the Defendant did not believe that the formula was the issue.

The victim's mother testified that the Defendant did not seem upset following the victim's death. She said that the Defendant was trying to watch a movie, that he was quiet, and that he was "trying to laugh at the movie."

The victim's grandmother testified regarding her care of the victim and stated that he was never injured while in her care. She had the opportunity to see the Defendant with the victim and said the Defendant loved the victim. She stated that there were times when she felt that the Defendant did not "hold [the victim] like [she] thought he should" and that the Defendant was too rough when bathing him. She stated that the Defendant otherwise "seemed to do all right" with the victim. The victim's grandmother testified about hearing the victim's mother scream for help on Father's Day, going to their home, seeing the Defendant perform CPR on the victim, and going to the hospital where the medical personnel informed the victim's family of their belief that the victim was being abused. The victim's grandmother stated that the Defendant never told her that he struck the victim's head on a steering wheel or that he dropped the victim in the bathtub. She said the victim's mother told her that the Defendant stated that he accidently tossed the victim onto a couch.

On cross-examination, the victim's grandmother testified that she never saw the Defendant or the victim's mother lose their tempers with the victim. The victim's grandmother acknowledged that when a police officer interviewed her, she told the officer that the Defendant and the victim's mother were good parents. She said she attempted to explain the victim's various medical issues to the officer but that the officer wanted to focus on the acts that led to the victim's injuries.

Ms. Roxanna Brown, a paramedic, was dispatched to the victim's home at 3:30 p.m. and arrived eight minutes later. The victim was being held by a neighbor who was a nurse. The victim was nonresponsive, was not breathing, and had a weak pulse. Ms. Brown hooked the victim to a cardiac monitor, intubated him, and provided him with oxygen and a round of cardiac medication. Once Ms. Brown intubated the victim, his lips began to regain a pink color and he was transported to a local hospital, arriving at 3:59 p.m.

On cross-examination, Ms. Brown testified that in intubating the victim, she initially placed the tube too far into esophagus. Once she realized her mistake, she removed the tube and reinserted it, after which the victim's lips and body began turning pink and his heart rate increased. She acknowledged that the surgeon at Vanderbilt Hospital noted that the victim suffered cardiac arrest and spent approximately thirty minutes without a heartbeat or blood pressure.

Marion County Sheriff's Department Detective Mary Beth Raulston was contacted by the Department of Children's Services (DCS) and arrived at the hospital on Sunday, June 17, at approximately 11:00 p.m. Detective Raulston visited the victim, who was lying in a hospital bed with bandages around his arm and his head. She interviewed the Defendant, the victim's mother, and the victim's grandmother. The Defendant did not mention to her anything that could have happened to the victim to cause his injuries.

Detective Raulston later interviewed Dr. Deborah Lowen, who stated that the victim's injuries were not the result of an accident. Following her interview with the doctor, Detective Raulston returned to the hospital on Tuesday and interviewed the Defendant and the victim's mother again. During the interview, the Defendant told her that approximately three weeks prior, he dropped the victim while bathing him and that the victim hit his head. The Defendant stated that the victim only cried for a short time.

Detective Raulston testified that on Thursday, the Defendant called her and stated that he recalled that after he awoke on Saturday morning, he got a bottle out of the refrigerator while holding the victim. The Defendant stated that as he was walking to the couch, he tripped on a screw that was sticking up out of the air vent on the floor and tossed the victim on the couch to avoid falling on the victim. The Defendant said that the victim's head bounced off a wooden portion of the couch's arm and that the Defendant fell to his knees with his arm on the victim. The Defendant stated that while the victim initially cried, he stopped once the Defendant fed him. The Defendant told Detective Raulston that he threw the flip flops that he was wearing in the garbage because one broke as he tripped over the screw. Detective Raulston testified that she did not believe that a person would forget such an event under the circumstances and stated that "it just wasn't adding up." She later searched the Defendant's home but did not locate his flip flops in the garbage.

On cross-examination, Detective Raulston testified that the Defendant also stated that the victim's mother had fallen on the victim while in bed. She spoke to the victim's mother who denied landing on the victim when she fell. Detective Raulston acknowledged that the victim had rib fractures that were at least ten days old and that the Defendant had been on a trip for fourteen days shortly before the victim's hospitalization. Detective Raulston did not focus her investigation on the victim's mother.

On redirect examination, Detective Raulston testified that her investigation was focused upon the brain injury, which resulted in the victim's death. She stated that based upon the information she received from the medical specialists, she focused upon the four days leading up to Father's Day, a time period during which the Defendant was at home.

Dr. Deborah Lowen, a pediatrician at Vanderbilt Children's Hospital, was a member of the medical team who treated the victim. She spoke to the Defendant and the victim's mother and reviewed the obstetric records of the victim's mother and the records of the victim's primary care physician. She did not review the hospital records from the victim's birth.

The Defendant reported to Dr. Lowen that the victim had been treated for an ear infection a week prior to his hospitalization. The Defendant stated that on Father's Day, he and the victim's mother fed the victim and went to a restaurant where the victim vomited a copious amount. They returned home to clean the victim, who was fussy. The Defendant said that although they gave the victim Pedialyte, he remained fussy, so they gave him milk. The Defendant reported that the victim vomited again and continued to be fussy. When the Defendant went to give the victim to his mother, the victim took a gasping breath and went limp. CPR was initiated, and an ambulance transported the victim to the hospital. Dr. Lowen stated that the history given by the victim's mother was consistent with the Defendant's statements.

Dr. Lowen testified that the victim had a normal birth weight and that his mother told her that the victim moved often at night while in the womb. Dr. Lowen stated that when she saw the victim in June 2012, his general condition and weight were consistent with a healthy three-month-old baby and that he had been developing normally based on the records. She noted that the records from the victim's primary care physician reflected that the victim had reflux, a common pediatric problem, and that the victim was fussy as a result.

Dr. Lowen did not see anything in the records from the ambulance services indicating that the paramedic took actions that contributed to the victim's condition. She noted that when the paramedic initially intubated the victim, she inserted the tube into the victim's esophagus rather than his trachea. Dr. Lowen stated that such issues occur often. The paramedic quickly recognized the issue and removed and replaced the tube.

Because the victim had a breathing tube, a chest X-ray was obtained to ensure that the tube was in the correct location. The chest X-ray revealed that the victim had multiple rib fractures and a broken collarbone, all of which were in the process of healing. Dr. Lowen stated that the rib fractures were lateral and were consistent with someone squeezing the victim. She estimated that the rib fractures were at least ten days old and possibly older. She did not see any outward signs of trauma to the victim's chest, such as bruising. She explained that external signs generally are not present in the vast majority of infants with broken ribs and that bruising might not have resulted if the fingertips were not used in grabbing or squeezing the victim's chest. She further explained that due to the age of the fractures, any bruising may have since disappeared.

Dr. Lowen testified that an infant's bones are pliable and bend quite a bit before breaking and that as a result, it is more difficult to break an infant's bones than would be expected. She found no evidence suggesting that the victim's bones were broken due to the lack of oxygen in the womb or that the victim actually lacked oxygen in the womb. She explained that had the victim lacked oxygen in the womb, the pregnancy would not have been uneventful, the victim might have experienced problems at birth, and he would not have been growing in an appropriate manner. Dr. Lowen stated that if the victim had problems with his bones, the problems would have affected all of the bones in his body. She also stated that she was unaware of any mechanism by which lack of oxygen could cause an infant's ribs to break. She noted that a newborn's bone mineralization is based on the mother's calcium supply and not upon the oxygen supply.

Dr. Lowen testified that the victim's oxygen levels were tested multiple times during his hospitalization because he was on a breathing machine. She stated that despite the fact that the victim stopped breathing at home and had a breathing tube inserted in his esophagus, the results of laboratory tests did not indicate that the victim lacked oxygen for a prolonged period of time.

A CAT scan was performed due to concerns that the victim was having seizures. The results showed acute subdural hematoma or bleeding around the victim's brain, which Dr. Lowen stated is generally caused by accidental or abusive trauma. Dr. Lowen said the victim's medical history did not indicate that the subdural hemorrhage was caused by something other than trauma. An MRI revealed that the victim had areas of brain tissue that were severely damaged. Dr. Lowen stated that such damage can be caused by trauma or lack of oxygen and that she believed the damage in the victim's brain tissue was caused by a combination of both. She believed that trauma was the predominant issue that led to the brain damage. She noted that the victim also had injuries to the ligaments in the back of his neck, which were caused by trauma. Dr. Lowen explained that infants become symptomatic immediately upon suffering abusive head trauma and that such symptoms can include irritability, vomiting, lack of breathing, and seizures. She noted that the victim vomited a significant amount throughout the day and stated that the vomiting was possibly a symptom of the head injury.

The victim also suffered from significant retinal hemorrhaging in both eyes. Dr. Lowen stated that while a small number of retinal hemorrhages in the center of the eyes can result from accidental trauma, the widespread retinal hemorrhages that covered the back of the victim's eyes was indicative of abusive head trauma. Dr. Lowen rejected a suggestion that the lack of oxygen can cause blood to hemorrhage into areas of the body that have numerous blood vessels.

Dr. Lowen concluded that the victim suffered abuse that resulted in his death. She also concluded that the abuse occurred on more than one occasion because the rib fractures and the head injury did not occur during the same episode. She agreed with the conclusions of the forensic pathologist who performed the victim's autopsy.

On cross-examination, Dr. Lowen acknowledged that the victim's mother told her that the victim's birth was rather quick and that the umbilical cord was wrapped around the victim's neck. The victim's mother stated that the victim had low blood sugar and received oxygen for approximately three hours. Dr. Lowen was not aware that the victim stopped breathing and turned blue while on the way home from the hospital. The victim's mother did not tell her that the victim had another episode during which he stopped breathing a few days or weeks after his birth. Dr. Lowen was aware of an episode during which the victim stopped breathing while with his grandmother.

Dr. Lowen noted that the victim's mother had taken the victim to a doctor on multiple occasions due to his reflux and ear infections. The victim's mother had changed formulas on multiple occasions to address the victim's spitting up and vomiting. The victim had been diagnosed with an ear infection a week prior to his hospitalization and was taking an antibiotic. The victim's parents stated that his symptoms were improving. Several weeks prior to the victim's hospitalization, the Defendant bumped the victim's head on the steering wheel. The victim's mother reported that the victim vomited on Friday prior to his hospitalization on Sunday, that he spit up on Saturday, and that he vomited on Sunday.

Dr. Lowen testified that the victim had a "choking episode" on Sunday that led to his hospitalization and agreed that the choking was possibly a symptom of the head trauma. She did not believe that the choking caused the degree of acute intracranial bleeding or retinal hemorrhaging found in the victim. She acknowledged that although the victim's lack of oxygen may have been a cause of the cerebral edema, she did not believe it was the sole cause of the victim's brain injury.

Dr. Lowen stated that some of the victim's rib fractures were at different stages of healing. She explained that the healing of rib fractures are generally first detected on an X-ray within ten to fourteen days of the fracture occurring. She stated that all of the rib fractures did not necessarily occur within ten to fourteen days of the X-ray and could have occurred up to three weeks prior to the X-ray.

On redirect examination, Dr. Lowen testified that a pediatrician would not have been able to diagnose the rib fractures absent an X-ray. She stated that the trauma to the brain, lack of skull fractures, and retinal hemorrhages generally are seen in a child who has been shaken violently and/or thrown onto a soft surface.

Dr. Bridget Eutenier, a forensic pathologist, performed the victim's autopsy. She spoke to Dr. Lowen and reviewed the victim's birth records and medical records. She stated that the victim appeared to have been well nourished and developing normally. She observed scratches on the victim's left shoulder, neck, and left ankle, all of which were in the process of healing. She noted that the victim had numerous rib fractures at varying stages of healing and a fractured clavicle that was in the process of healing. She observed an acute fracture on the victim's posterior rib, which she stated typically does not result from medical intervention.

Dr. Eutenier testified that the victim had two linear contusions and an accompanying subgaleal hemorrhage on the right side of his scalp, which she believed were the result of attempts to place IVs in the victim's scalp. The victim also had a contusion and an accompanying subgaleal hemorrhage on the left side of his scalp, which Dr. Eutenier testified was consistent with blunt force trauma. She observed subdural and subarachnoid blood in the victim's brain, which can result from blunt force trauma. Upon viewing the brain tissue under a microscope, Dr. Eutenier observed subarachnoid hemorrhages on the brain tissues, evidence of injuries to the nerve fibers of the brain, areas of lack of oxygen or blood flow to the brain, and "an area that was indicative of an older type injury."

Dr. Eutenier observed subdural hemorrhaging surrounding the thoracic and lumbar areas of the victim's spine. She stated that the hemorrhaging could be indicative of trauma or could be a result of subdural hemorrhaging within the brain leaking down into the spinal canal. She observed optic nerve sheath hemorrhages and multiple retinal hemorrhages in the victim's eyes. She stated that the hemorrhages can be caused by blunt force trauma, such as shaking, or by increased intracranial pressure from blood inside the cranial cavity. She concluded that the victim's cause of death was blunt force injuries to his head and neck and that the manner of his death was homicide.

On cross-examination, Dr. Eutenier acknowledged that she understood that there was a suspicion of child abuse prior to performing the autopsy. She stated that the victim's weight fell within the tenth percentile range, which was not unexpected due to his feeding difficulties. She was unaware of prior occasions during which the victim turned blue due to lack of oxygen. She acknowledged that while lack of oxygen can cause retinal hemorrhages, increased intracranial pressure, and brain damage, she stated that subdural and subarachnoid hemorrhages and axonal injury to the brain does not result from lack of oxygen.

Mr. Jerry Layne, who was an inmate with the Defendant at the Marion County Jail for a period of time, acknowledged that he was serving a ten-year sentence, had thirteen prior felony convictions, and had been in and out of jail since 1992. Mr. Layne testified

that, while in jail, the Defendant approached him and began speaking to him. Mr. Layne told the Defendant that if he was going to admit to killing the victim, Mr. Layne was not in the mindset to talk about it that day. Instead, the Defendant asked him about prison life and whether the Defendant would have a "rough road." Mr. Layne told the Defendant that if the Defendant had gone to prison in 1992 when Mr. Layne was first imprisoned, the Defendant likely would have been killed. The Defendant and Mr. Layne also discussed the Defendant's possible sentence.

Mr. Layne testified that the Defendant approached him two or three days later, and Mr. Layne told him, "You can talk to me today, I'm in a different emotion. I can handle it." The Defendant stated that while the victim was crying, the Defendant got out of bed and shook him. He said, "I shook [the victim] and shook and [the victim] finally quit crying." The Defendant stated that he set the victim down and returned to bed. The Defendant told Mr. Layne that once he fell asleep, the victim began crying, so he shook the victim again. The Defendant said that when the victim did not stop crying, he "pitched" the victim toward the bed and that the victim hit the mattress. Mr. Layne testified that when he told the Defendant that would not kill a child, the Defendant replied, "Well, that's what I did." The Defendant stated that he rolled the victim over, that the victim took a breath, and that "I knew [the victim] was dead."

Mr. Layne testified regarding the various officers to whom he reported the Defendant's statements. Shortly before trial, Mr. Layne met with Investigator Allan Weeks, whom Mr. Layne had known all of his life, another officer, and Mr. Layne's attorney. Mr. Layne acknowledged that while someone from the State agreed to write a letter recommending him for parole, he denied making any other deal with the State in exchange for his testimony at trial. He stated that he declined parole on two occasions and that he was testifying because "it's the right thing to do."

On cross-examination, Mr. Layne acknowledged that the majority of his felony convictions involved crimes of dishonesty. He received a ten-year sentence as a result of a guilty plea in September 2014 and had written letters seeking to withdraw his plea.

Mr. Layne testified that he informed the officers that when he told the Defendant that the victim would not have been killed by hitting the mattress, the Defendant replied that the victim could have hit the wall. Mr. Layne acknowledged that Investigator Weeks deposited $20.00 in his commissary account after Mr. Layne asked to borrow money and told Investigator Weeks that Mr. Layne's aunt would repay him. Mr. Layne denied that Investigator Weeks deposited the money on the same day as the interview.

The defense presented the testimony of Dr. Thomas Young, a forensic pathologist, who provides consultation services. Dr. Young reviewed the victim's medical records

relating to his hospitalization, the autopsy report, the autopsy photographs, and the glass slides from the autopsy. He noted that the victim had a choking spell after drinking formula and prior to his hospitalization. He concluded that the "choking spell, as described by witnesses, [wa]s consistent with the outcome of [the victim] in this case." He stated that the records did not include any witness account of abuse or trauma and that witnesses only reported that the victim was unresponsive, was not breathing, and had a pulse.

Dr. Young testified that from the autopsy, the victim's brain had areas of both recent hemorrhages and older hemorrhages. He stated that the older damage was of the type that would have occurred in the womb due to the lack of oxygen or blood flow to the brain. He also stated that such damage affected the brain stem and spinal cord and could explain the episodes during which the victim choked and stopped breathing. Dr. Young testified that due to the brain damage in the womb, the victim did not move much in utero and that his bones were weak as a result. He stated that the ribs of an infant with weak bones can fracture as a result of normal handling.

Dr. Young testified that while retinal hemorrhages have been considered indicative of shaken baby syndrome, recent research in this area has revealed that retinal hemorrhages occur in a wide variety of conditions. He explained that retinal hemorrhages can occur during attempts to resuscitate a child who is not breathing but has a pulse. The blood vessels in the retina weaken due to lack of oxygen and leak into the retina. He stated that the blood passes through the same space where the brain has swollen due to the lack of oxygen and that stagnation further contributes to hemorrhages in the retinas. Dr. Young explained that the lack of oxygen does not affect all of the blood vessels in the body in a similar manner because some areas do not require as much oxygen as the brain or the back of the eyes.

Dr. Young testified that the resurgence of blood pressure and oxygen in the blood vessels of the dura after being deprived of oxygen can cause blood to leak into the subdural compartment, forming a thin rod of subdural hemorrhages. He stated that the victim's subdural and subarachnoid hemorrhages could have resulted from the victim's cessation of breathing and subsequent resuscitation. Dr. Young disagreed with Dr. Eutenier's findings of abusive head injury as the victim's cause of death.

On cross-examination, Dr. Young testified that he did not have an issue with Dr. Eutenier's performance of the autopsy or her findings of rib fractures and hemorrhaging in the brain and retinas. Rather, Dr. Young disagreed with Dr. Eutenier's conclusions.

In rebuttal, the State presented the testimony of Dr. Adele Lewis, a forensic pathologist, who testified that there was no medical basis for Dr. Young's opinion that

- 12 -

the victim's injuries were the result of the loss of oxygen to the brain. Dr. Lewis was not aware of any reports of children suffering from bleeding to the brain and eyes and multiple broken bones due to the lack of oxygen. She explained that if Dr. Young was correct, such injuries would be sustained by children who die from asthma, pneumonia, or heart disease and that no such injuries occur in those situations.

Dr. Lewis testified that there was no medical basis for Dr. Young's conclusion that a lower level of oxygen in the womb caused the victim's bones to easily break. She explained that Dr. Young's conclusion was based upon a hypothesis that was not embraced by the "mainstream medical community." She also testified that there was no indication that the victim's death was the result of something other than homicide.

The Defendant was charged with felony murder during the perpetration of or attempt to perpetrate aggravated child abuse and aggravated child abuse. The jury convicted the Defendant of second degree murder and aggravated child abuse, and the trial court imposed concurrent twenty-five-year sentences for each conviction.

## ANALYSIS

### A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his convictions. He specifically contends that the evidence, at most, established that the victim's death was accidental. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is

then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). A person commits child abuse who "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." T.C.A. § 39-15-401(a). As it applies to this case, aggravated child abuse is defined as child abuse resulting in serious bodily injury to the child. T.C.A. § 39-15-402(a)(1). "'Serious bodily injury to the child' includes, but is not limited to, … a fracture of any bone, … subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, [and] brain contusion." T.C.A. § 39-15-402(d). Aggravated child abuse is a Class A felony if the child is eight years of age or younger. T.C.A. § 39-15-402(b).

The Defendant bases his challenge to the sufficiency of the evidence upon his claim that the victim's injuries were the result of an accident. However, both Dr. Lowen and Dr. Eutenier testified that the victim's death was the result of abuse. Dr. Lowen stated that while accidental trauma can cause a small number of retinal hemorrhages in the center of the eyes, the widespread retinal hemorrhages that covered the back of the victim's eyes were indicative of abusive head trauma. Dr. Eutenier concluded that the victim died from blunt force injuries to his head and neck and that blunt force trauma can result from shaking. The victim had older injuries in the form of multiple broken ribs that were in the process of healing, and Dr. Lowen testified that the injuries were consistent with someone squeezing the victim. The Defendant admitted to Mr. Layne that he shook the victim multiple times because the victim would not stop crying and then threw the victim onto a mattress during which time the victim possibly hit his head on a wall. The Defendant appeared unconcerned following the victim's death and instead watched a movie and attempted to engage in sexual activity with the victim's mother. The Defendant did not attend the victim's visitation at the funeral home and was one hour late for the victim's funeral.

On appeal, the Defendant relies upon his statements to Detective Raulston that the victim hit his head three weeks prior to his hospitalization when the Defendant

accidentally dropped him in the bathtub and that the victim hit his head on the arm of a couch the day before his hospitalization when the Defendant tossed him on the couch to avoid falling on him. At trial, the Defendant presented evidence through Dr. Young that the victim died as a result of his medical conditions and not through abuse. The jury rejected the Defendant's explanations and Dr. Young's testimony, which was their prerogative. As noted above, questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *Bland*, 958 S.W.2d at 659. We conclude that the evidence, when viewed in a light most favorable to the State, is sufficient to support the Defendant's convictions for second degree murder and aggravated child abuse.

## B. Denial of a Continuance

The Defendant asserts that the trial court erred in denying his motion to continue the trial filed on August 15, 2016, the morning of trial, due to the State's late disclosure of Mr. Layne as a witness. During a hearing on the motion, the prosecutor stated that Mr. Layne had written a letter to the District Attorney General claiming that he had knowledge about the Defendant's case. The prosecutor, who apparently had some involvement in the case initially, stated that he returned to the case toward the end of July and learned that no one had spoken to Mr. Layne. Officers interviewed Mr. Layne on July 29. Defense counsel stated that the State provided him with Mr. Layne's tape recorded interview with law enforcement on August 3 but that due to the formatting of the recording, he was unable to listen to it until August 5. Defense counsel acknowledged that he was unable to interview Mr. Layne because Mr. Layne was represented by counsel. Rather, defense counsel maintained that he needed to interview those people to whom Mr. Layne claimed he relayed the Defendant's statements. The prosecutor stated that the State had not interviewed any of those witnesses to verify Mr. Layne's claims and that he did not oppose the Defendant's motion to continue.

The trial court denied the Defendant's motion, noting that the people with whom Mr. Layne maintained he spoke were all jail personnel and were available to interview. The trial court asked the State to assist in locating the witnesses and stated that it would recess court at a reasonable time for the first few days of trial to allow the defense an opportunity to interview the witnesses. The trial court also noted the difficulty in resetting the trial as a basis for denying the Defendant's request for a continuance. During the trial, the parties located two law enforcement officers to whom Mr. Layne maintained that he spoke following his conversation with the Defendant. The Defendant, however, did not call either of them as witnesses at trial.

In the Defendant's motion for new trial, he stated that following the trial, the defense investigator interviewed Mr. Jamichael Shepherd, who had been an inmate with

Mr. Layne at the Marion County Jail. Mr. Shepherd stated in his affidavit attached to the Defendant's motion that on the day that Mr. Layne testified at trial, Mr. Layne told him that the State and Mr. Layne's attorney approached him about testifying against the Defendant. Mr. Layne told Mr. Shepherd that the prosecution believed that the Defendant had confessed the homicide to Mr. Layne's mother, who subsequently died. According to Mr. Shepherd, Mr. Layne said that the State wanted Mr. Layne to testify as if the Defendant had confessed to him even though the Defendant never made any admission to him. Mr. Shepherd also stated that Mr. Layne admitted he "had been made promises that included his sentence and monetary compensation." Mr. Shepherd acknowledged that he did not tell anyone about his conversation with Mr. Layne until after the Defendant's trial.

Mr. Shepherd also testified during the hearing on the Defendant's motion for new trial. While Mr. Shepherd's testimony was scattered and difficult to decipher, he essentially testified that while he and Mr. Layne were housed in the same pod at the local county jail, Mr. Layne informed him that he did not have any knowledge about the Defendant's case. Mr. Shepherd stated that Mr. Layne told him that the Defendant had confessed to Mr. Layne's mother and that "some people" visited Mr. Layne at the jail and asked him to testify against the Defendant. Mr. Shepherd testified that Mr. Layne said he was receiving a "time cut" as a result. Mr. Shepherd said that after he "flipped out" in the pod, he was transferred to the pod where the Defendant was housed and informed the Defendant of his conversation with Mr. Layne. On cross-examination, Mr. Shepherd acknowledged that when he was transferred to a holding cell with the Defendant, Mr. Shepherd was upset with the way that he had been treated while at the jail. In denying the Defendant's motion for new trial, the trial court found Mr. Shepherd's testimony to be "highly questionable at best."

The granting of a continuance rests within the sound discretion of the trial court. *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004). This court will reverse the trial court's denial of a continuance only if the trial court abused its discretion and the defendant was prejudiced by the denial. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995). To show prejudice, the defendant must establish that a different result might reasonably have been reached if the trial court had granted the continuance or that the trial court's failure to grant the continuance denied the defendant a fair trial. *Id.* Although a continuance may be appropriate in order to afford a defendant a "reasonable opportunity" to locate a witness, the defendant has the burden of showing that a continuance might have reasonably resulted in locating the witness. *State v. Morgan*, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991).

The record establishes that although the State disclosed Mr. Layne as a witness almost two weeks prior to the trial, defense counsel did not move for a continuance until

the morning of trial. Defense counsel did not set forth what attempts, if any, that he made to locate any potential witnesses. Defense counsel only requested the opportunity to interview those to whom Mr. Layne informed of his conversation with the Defendant. Rather than grant a continuance, the trial court made provisions to accommodate the defense by granting defense counsel the opportunity to interview those witnesses, all of whom were local law enforcement officers, and the trial court asked the State to assist in locating the witnesses. The record reflects that the parties located two witnesses, neither of whom were called to testify at trial.

The Defendant asserts that had the trial court granted the continuance, he would have been able to locate Mr. Shepherd and present his testimony at trial. However, according to Mr. Shepherd's affidavit, he did not have a conversation with Mr. Layne until the day that Mr. Layne testified at trial. Thus, a continuance would not have reasonably resulted in the defense locating Mr. Shepherd and securing his testimony. Furthermore, the trial court found Mr. Shepherd's testimony to be "highly questionable at best." Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for a continuance and that the denial of the continuance did not result in prejudice.

### C. Newly Discovered Evidence

The Defendant next contends that Mr. Shepherd's testimony constitutes newly discovered evidence that warrants a new trial. A defendant who seeks relief in a motion for new trial based on newly discovered evidence must establish: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) the evidence would likely change the result of the trial." *State v. Caldwell*, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing *State v. Goswick*, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Generally, evidence that only "contradicts or attempts to impeach" witness testimony is insufficient to entitle a defendant to a new trial. *State v. Sheffield*, 676 S.W.2d 542, 554 (Tenn. 1984). A trial court, however, may grant a new trial "if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal." *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993). The determination of whether to grant or deny a motion for new trial based on newly discovered evidence "rests within the sound discretion of the trial court." *State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995).

In rejecting the Defendant's claim that he is entitled to a new trial based on newly discovered evidence, the trial court found Mr. Shepherd's testimony to be "highly questionable at best and certainly not strong enough to have changed the jury's decision in light of all the other proof in the case." This court has recognized that "[a]n assessment of the witnesses' credibility by the trial court is essential in order for the trial

court to determine whether the evidence is likely to change the result of the trial." *State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001). In assessing the credibility of the evidence, the trial court must deny the motion for new trial "'if the [c]ourt concludes that the evidence would not be worthy of belief by the jury.'" *Id*. (quoting *State v. Marlon D. Beauregard*, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at *4 (Tenn. Crim. App. May 26, 2000)). When a trial court's denial is based upon a finding that the newly discovered evidence lacks credibility, this court will not conclude that the trial court abused its discretion. *See Walker*, 910 S.W.2d at 395. Because the trial court declined to credit Mr. Shepherd's testimony, we conclude that the trial court did not abuse its discretion in declining to grant the Defendant a new trial based upon newly discovered evidence.

### D. Sentencing

The Defendant maintains that his concurrent twenty-five-year sentences are excessive. A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by

the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(4), (5).

As a Range I, standard offender, the Defendant was subject to a sentence of fifteen to twenty-five years for each of his convictions of second degree murder and aggravated child abuse, both Class A felonies. *See* T.C.A. §§ 39-13-210(c), 39-15-402(c), 40-35-112(a)(1). The trial court applied the following enhancement factors to the Defendant's second degree murder conviction: (4) the victim was particularly vulnerable due to age or physical or mental disability; (5) the Defendant treated, or allowed the victim to be treated, "with exceptional cruelty during the commission of the offense"; (10) the Defendant "had no hesitation about committing a crime when the risk to human life was high"; and (14) the Defendant abused a position of public or private trust. *See* T.C.A. § 40-35-114(4), (5), (10), (14). The trial court applied the following enhancement factors to the Defendant's conviction for aggravated child abuse: (6) the personal injuries inflicted upon the victim were particularly great; (10) the Defendant "had no hesitation about committing a crime when the risk to human life was high"; and (14) the Defendant abused a position of public or private trust. *See* T.C.A. § 40-35-114(6), (10), (14). The trial court found that no mitigating factors applied. The trial court imposed two concurrent twenty-five-year sentences, the maximum sentence for each offense.

On appeal, the Defendant does not specifically challenge the trial court's application of any specific enhancement factor. Rather, the Defendant maintains that the trial court erred in considering Mr. Layne's testimony in imposing the sentences. The Defendant asserts that Mr. Layne's testimony was "unbelievable" and only established that the victim's death was accidental. However, as the State notes, the trial court is required to consider evidence presented at trial in imposing a sentence. *See* T.C.A. § 40-35-210(b)(1). Furthermore, as we have held, Mr. Layne's testimony and the other evidence presented at trial were sufficient to establish that the victim's death was the result of abuse and was not the result of an accident.

The State concedes that because serious bodily injury is an element of aggravated child abuse, the trial court misapplied the enhancement factor that the personal injuries suffered by the victim were particularly great to the Defendant's conviction for aggravated child abuse. *See* T.C.A. § 40-35-114(6). However, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence

imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. There is nothing in the record establishing that the trial court wholly departed from the statutes in applying the various enhancement factors and imposing the within-range sentences. Accordingly, the trial court did not abuse its discretion in imposing the sentences.

## CONCLUSION

Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.


_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE